439 So.2d 552 (1983)
LOUISIANA NATIONAL BANK OF BATON ROUGE
v.
Lawrence F. O'BRIEN, Jr.
No. 83 CA 0008.
Court of Appeal of Louisiana, First Circuit.
October 11, 1983.
Writ Denied December 9, 1983.
*553 Fredrick Tulley and Ashley Moore, Baton Rouge, for plaintiff-appellant La. Nat. Bank of Baton Rouge.
Larry Bankston, Baton Rouge, for defendant-appellee Lawrence F. O'Brien, Jr.
Before SHORTESS, LANIER and CRAIN, JJ.
CRAIN, Judge.
This is an appeal of a judgment of the trial court dismissing the suit of Louisiana National Bank of Baton Rouge (LNB), as pledgee of a demand note in the sum of $280,000.00, against the maker of the note, Lawrence F. O'Brien, Jr.
The Hilton Hotel in Baton Rouge, Louisiana, was financed, built and owned by a partnership in commendum named Jules B. LeBlanc, III-Corporate Hotel Partnership (hereafter partnership). The principal person involved in the partnership was Jules B. LeBlanc, III. The hotel project was part of the development of Corporate Square in Baton Rouge. The major lender on the property was Chase REIT Bank in New York. When Chase required $2,250,000.00 be infused into the partnership to avoid closing down the project, LNB loaned the money to a Don Odom, who bought a 50 percent interest in the partnership with the money and then pledged that entire interest to the bank to secure the loan. The record reflects that LNB thought it was receiving 50 percent of the ownership pledged for its loan, but the documentation does not reflect that, and LNB became concerned about its security after learning of the transaction between the partnership and O'Brien.
The transaction between the partnership and O'Brien apparently occurred when the partnership incurred further financial difficulties and needed additional investors. On December 2, 1975, O'Brien gave the partnership $220,000.00 in cash and executed a "negotiable in rem note" to the partnership *554 for $280,000.00. The nine percent partnership interest was pledged to the partnership to secure the $280,000.00 note.
O'Brien appointed the partnership of LeBlanc & Brinkley to act as his agent in matters relative to the hotel partnership. The note executed by O'Brien was subsequently transferred by the partnership to Jules B. LeBlanc, III, individually, on December 5, 1975. The record indicates that O'Brien was aware of this transfer, and at least for tax purposes, it was treated as payment of a fee for the work LeBlanc had done in relation to the hotel.
Charles W. McCoy, chairman of the board and chief executive officer of LNB, testified that during early 1976 he began to believe that LNB had not received all of the security it thought it was to receive when it granted the two and one quarter million dollar loan. McCoy then contacted LeBlanc and insisted that LeBlanc collaterally pledge to LNB the note executed by O'Brien. LeBlanc did so in February of 1976.
In late 1977, the partnership and Jules B. LeBlanc, III, individually, were placed in bankruptcy. The $280,000.00 note was listed in LeBlanc's individual bankruptcy petition. The bankruptcy court ordered the note returned to LNB.
In September, 1979, LNB served notice on O'Brien to pay the note. This was the first notice received by O'Brien that the note had been pledged to LNB three and one-half years earlier. O'Brien refused to pay the note, and suit was brought against him by LNB.
The trial court ruled that the note in question was a non-negotiable note. As such, written notice of its transfer had to be given to O'Brien within a reasonable time. Based on its finding that such notice was not given for over three years, the trial court ruled that the pledge to LNB was invalid, and consequently LNB had no right of action on the note.
LNB filed this appeal alleging, in addition to other errors, the trial court erred in concluding that LNB had no right of action because of an invalid pledge. We find that the judgment of the trial court was incorrect.

I. VALIDITY OF THE PLEDGE
A. EFFECT OF NONCOMPLIANCE WITH LA.C.C. ARTS. 3158 AND 3160 ON VALIDITY OF THE PLEDGE AS TO THE DEBTOR ON THE NOTE PLEDGED.
The trial court ruled that the note in question was a non-negotiable note, despite the fact that the note itself states that it is a "Negotiable In Rem Note ". The correctness of this ruling is conceded by all parties.[1] Consequently, all of LNB's rights are contingent on the validity of the pledge of the non-negotiable instrument. The validity of the pledge depends on whether compliance with La.C.C. Art. 3158 is necessary to have a valid pledge as against the debtor on the pledged instrument, and if so, whether there was compliance with La.C.C. Art. 3158 in the instant case.
La.C.C. Art. 3157 provides that a pledgee can satisfy his debt in preference to other creditors of his pledgor, out of the asset pledged. Further, La.C.C. Article 3158 provides:
But this privilege shall take place against third persons only in case the pledge is proved by some written instrument, in which shall be stated the amount of the debt intended to be secured thereby, and the species and nature of the thing given in pledge; or the description of the thing pledged may be contained in a list or statement annexed to the instrument of pledge and giving its number, weight or descriptive marks.
When a debtor wishes to pledge promissory notes, bills of exchange, bills of lading, stocks, bonds, policies of life insurance, or written obligations of any kind, he shall *555 deliver to the creditor the notes, bills of exchange, bills of lading, stocks, bonds, policies of life insurance, or other written obligations, so pledged, and such pledge so made, except as hereinafter provided with regard to life insurance policies, shall without further formalities be valid as well against third persons as against the pledgor thereof, if made in good faith, provided that where the pledge of instruments not negotiable, the debtor must be notified thereof, it being understood that no notification is required in the case of the pledge of certificates of corporation stock.
Additionally, La.C.C. art. 3160 provides that: "When the thing given in pledge consists of a credit or instrument not negotiable, the pledge shall be complete as to all the world, as soon as the debtor of such pledged credit or instrument shall have been notified in writing of the giving of such pledge."
The scheme of these articles then is as follows: A pledgor can pledge an asset to a pledgee, and thereby give the pledgee the right to proceed directly and by preference to collect the asset and apply it to the pledgor's debt to the pledgee. La.C.C. art. 3157. If there are other creditors of the pledgor, and the pledge is of a nonnegotiable instrument, these creditors lose their rights to the pledged instrument if the debtor on the instrument is notified of the pledge. Under La.C.C. art. 3160 this notification must be in writing.
This interpretation of these articles is consistent with the jurisprudence. In Williams v. Succession of Robertson, 133 La. 640, 63 So. 250, 251 (1913), quoting from Commercial Bank of Alexandria v. Shanks, 129 La. 861, 56 So. 1028 (1911), the statement is made that: "A pledge of a nonnegotiable instrument not only requires delivery but written notice thereof to the debtor himself. Civil Code, arts. 3158, 3160, as amended by Act No. 157 of 1900, pp. 239, 240." It is noteworthy that this statement was made with reference to both La.C.C. arts. 3158 and 3160. The reason obviously is because these articles both apply to validity of a pledge as to other creditors of the pledgor, which was the factual situation in both cases.
Only in Foote v. Sun Life Assur. Co. of Canada, 173 So. 477 (La.App.Orleans 1937) was the court faced with an attack on the pledge by the pledgor. There it was held that La.C.C. Art. 3160 was,
without application to the immediate parties to the agreement and may only be invoked by a third person. The obvious purpose of its enactment was to prevent the debtor of the security pledged from paying his obligation to the pledgor or to anyone else, other than the pledgee, where he has written notice of the pledge. 173 So. at 481.
The appellate court further noted that the Commercial Bank and Williams cases, were inapplicable. Consequently, Foote recognized that La.C.C. Art. 3158 was also applicable only to third party creditors of the pledgor.
It is argued that the debtor on the security pledged is in the same position as a third party referred to in La.C.C. Art. 3158 and 3160. We do not agree. In none of the cases cited did the debtor on the security pledged attack the pledge. In fact, in all of the cases it was a basic assumption that the debtor on the security owed someone, depending on the effectiveness of the pledge.
Third parties referred to in La.C.C. Arts. 3158 and 3160 are obviously creditors of the pledgor because their rights to an asset of their debtor are being affected by the pledge as a result of La.C.C. Art. 3157. The debtor on the security pledged certainly stands in place of the pledgor. He has no more rights than the pledgor with reference to the pledge itself. Since La.C.C. Arts. 3158 and 3160 cannot be invoked by the pledgor to invalidate the pledge, they cannot be invoked by the debtor on the security for the same purpose.
Consequently, the trial court was incorrect in applying La.C.C. Arts. 3158 and 3160 to invalidate the pledge herein.

*556 B. EFFECT OF THE SEVEN DAY NOTICE PROVISION CONTAINED ON THE NOTE.
The note in question provides that a "transfer from the payee named herein to another party or any subsequent transfer shall require ... that notice of said transfer be sent to the undersigned within seven days thereof." This language contemplates seven days notice in order to effect a valid transfer of title. It does not require seven days notice in order to effect a valid pledge.[2] A transfer of title does not take place with a pledge. People's Bank v. Cookston, 142 So. 285 (La.App. 2d Cir.1932). A pledgee acquires the right to proceed against the security pledged up to the amount of the debt owed the pledgee by the pledgor. La.C.C. Art. 3220. The pledged property is only a deposit to secure the pledge by the pledgor. La.C.C. Art. 3166. A depositor remains the owner of the thing deposited. La.C.C. Art. 3222.
Consequently, the note does not require seven days notice to the maker in order to effect a valid pledge.
Argument was made that the note was transferred from the partnership to Jules LeBlanc, III, individually without complying with the transfer provisions. Consequently, it is argued that Jules LeBlanc, III, individually did not have ownership of the note when he pledged it. The court is satisfied after reading the endorsement that it effects a transfer to Jules B. LeBlanc, III from the partnership. Additionally, the trial court found that the maker of the note knew of the transfer thus satisfying the seven day notice requirement. We find no manifest error in this holding. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Thus, we agree that Jules LeBlanc, III, individually had title to the note when he pledged it to the plaintiff.
Consequently, it is our determination that the trial court erred in finding that the plaintiff has no right to proceed on the note in question. The extent of plaintiff's right remains to be resolved.

II. CLASSIFICATION OF THE "IN REM" NOTE AND EFFECT THEREOF
The note in question is secured by the pledge of a nine percent interest in the partnership which the note along with $220,000.00 cash was given to purchase. It is contended that the maker of the note has no personal liability and that the owner is limited to execution on the nine percent partnership interest which was the security given for the note.
Two questions are raised. Does the note attempt to limit liability to the security? If so, what effect does this limitation have on the liability of the maker of the note in this state?
A. INTERPRETATION OF THE NOTE
We conclude that the note clearly attempted to limit the liability of the maker to the security furnished. The note provides:
This note is secured by an instrument entitled Collateral Pledge of Limited Partnership Interest of even date herewith. Said Collateral Pledge defines and describes the sole and absolute security for payment of this note in the event of nonpayment upon demand and is incorporated herein and made a part hereof. (emphasis added)
The pledge agreement incorporated into the note by the above language provides:
This instrument is in all respect to be construed as a special mortgage, pledge, hypothecation and confession of judgment under the laws of the State of Louisiana by Pledgor in favor of said *557 Pledgee and any Future Holder of said note as the sole security for the payment of the principal and interest of the said in rem note above described in the event of non performance thereof. (emphasis added)
The use of the terms "sole and absolute security" and "sole security" in the note and pledge are indications that the parties intended some limitation of liability on the note, although by themselves, we do not find they are sufficient to limit liability.[3] However, the note is labeled and described throughout both the note and the pledge as an "in rem" note. "In rem" is a technical phrase or term of art whose meaning is accepted by those who deal in such matters. La.C.C. art. 1947. Its accepted meaning is, "a shorthand identification for a mortgage that stipulates no personal liability on the part of the mortgagor". Nathan, The "In Rem" Mortgage, 44 Tul.L. Rev. 497, 497 (1970).
In the least, all of the above language creates ambiguity as to the true intent of the parties which must be resolved by parol evidence. La.C.C. art. 1950. A careful review of the record indicates that the only evidence as to the intent of the parties when the note and pledge were executed is the testimony of Lawrence O'Brien, Jr. that there was to be no personal liability on his part on the note.[4]
It is argued that the terms of the partnership agreement itself must be looked to in order to determine the intent of the parties. That agreement indicates that the capitalization schedule was changed to reflect a $500,000.00 contribution by O'Brien. Capital contributions were required to be in cash or its equivalent. This indicates personal liability on the part of O'Brien else the ownership of the partnership itself would be used for capitalization of the partnership.
There may be serious questions as to whether O'Brien properly contributed to the partnership for the interest he received and as to the extent of his liability to creditors of the partnership. However, the terms of the partnership agreement are not persuasive in interpreting the documents at issue before the courtthe note and the pledge agreement.[5]
We therefore hold that the note and the pledge agreement constitute an agreement by O'Brien to be liable only to the extent of the 9% partnership interest pledged, excluding any personal liability on his part for the $280,000.00 note.
B. VALIDITY OF THE AGREEMENT
Pledges in Louisiana are accessory obligations which depend on primary personal obligations for their validity. It is contended that pledges would not exist if the debtor on the security pledged was liable only to the extent of the property pledged by him to the creditor.
With reference to mortgages, although there has been no jurisprudence specifically sanctioning the "in rem" mortgage in this state, its usage is apparently widespread. See Nathan, supra. The Louisiana Supreme Court, while not faced specifically with a case involving the validity of the "in rem" mortgage, has not been reluctant to use the term in considering acceptable means of financing. See, Keene v. Williams, 423 So.2d 1065 (La.1982), Kavanaugh v. Berkett, 407 So.2d 645 (La.1981). We *558 approve the analysis of Mr. Max Nathan in The "In Rem" Mortgage where he states:
If C loans D $25,000 which is repayable only out of specified assets, there is a "duty" to repay the $25,000, even though not all of D's estate is obligated to repay it. Whether the correlative aspect of C's right to be repaid the $25,000 which he has advanced is called a "duty" or an "obligation" or a "debt", it seems perfectly apparent that C is entitled to be repaid. And it appears naive to contend that the correlative aspects of that right are not in the nature of a debt or obligation. In any event, the transaction is patently "some engagement" within the terms of Articles 3290 of the Code even if it does not give rise to a personal obligation or debt. Article 3290 defines mortgage in terms of securing "the execution of some engagement", and it strains semantics to belabor distinctions between duty, obligation, debt and "some engagement". In other words, unless C intends the $25,000 as a gift to D, there is a duty to repay. That duty to repay should suffice as a principal obligation and ought to be sufficient to support an accessorial obligation" (footnotes omitted), Nathan, supra, at 509.
According to La.C.C. art. 3133, "the pledge is a contract by which one debtor gives something to his creditor as a security for his debt." Mortgage is simply a species of pledge binding the thing mortgaged for payment of the debt. La.C.C. art. 3279. Mortgage and pledge are similar in that in both they are given to the creditor to secure his debt. La.C.C. art. 3280. They differ in the "pledge has for its object only movables, corporeal or incorporeal",[6] and that in pledge the thing pledged is delivered. La. C.C. art. 3281. There is nothing in the nature of the two security devices which would render an "in rem" mortgage valid and an "in rem" pledge invalid. There is a real "debt" in both sufficient to support an accessory obligation, whether or not that "debt" involves personal liability.[7]
We therefore hold that the obligation of O'Brien is limited to the security pledged for his indebtedness.[8]
Accordingly, we reverse the judgment of the trial court dismissing plaintiff's suit due to no right of action. We further render judgment dismissing the suit of plaintiff, LNB, against defendant, Lawrence F. O'Brien, Jr., personally. We reserve to LNB the right to proceed, in accordance with law, to collect its debt against the asset pledged for payment of the promissory note sued upon. We assess all costs equally between the parties.
REVERSED AND RENDERED.
NOTES
[1] Although termed a "negotiable in rem" note, the note contained language incorporating the terms of the pledge of the partnership interest. Consequently, the note becomes nonnegotiable under La.R.S. 10:3-105(2)(a).
[2] This interpretation of the note is supported by the sentence in the paragraph containing the seven day notice requirement, which states that, "This note is negotiable". Obviously, after stating the note is negotiable the transfer language was to specifically provide the method of negotiating or transferring the negotiable note. Being negotiable, the ownership of the note was subject to transfer by simple endorsement. Thus, the seven day requirement was to provide added protection to the maker in the event the title to the note was transferred.
[3] LNB's argument centers more on what the note and pledge lack than on what they contain. They lack a provision expressly excluding personal liability. Without the "in rem" language in both the note and the pledge this argument would be persuasive.
[4] The actions of the parties to the note give some indication of their intent. Even when the Partnership and LeBlanc were going into bankruptcy the note was never called, indicating it was not considered to be a source of revenue separate and apart from the value of the partnership interest. Additionally, the Referee in Bankruptcy undoubtedly did not consider it an asset that would contribute to satisfying the creditors.
[5] Neither does the treatment of the note and pledge by the partnership make the note and pledge contra bonos mores. Our concern is with the note and its effect, not with any problems that may exist in and with the Partnership.
[6] See, however, La.C.C. art. 3135 providing for antichresis, the pledge of an immovable.
[7] If the 9 percent Partnership interest were considered to have a value equal to or in excess of $280,000.00, the argument over "debt" would lack any meaning whatsoever. If the $280,000.00 could be recovered by execution on the partnership interest then when LNB received the $280,000.00 they certainly would be collecting on O'Brien's debt.
[8] Our holding moots the question raised by O'Brien as to the court's jurisdiction over the person.